## Gorson, Appellant, *v.* Ætna Accident & Liability Co.

## Gorson, Appellant, *v.* Preferred Accident Ins. Co.

*Insurance—Burglar insurance—Books of account—Failure to perform covenants of policy.*

1. Stipulations in burglary policies covering business establishments, that "books and accounts" shall be kept by the insured, so that, in case of theft, the exact loss can be ascertained, are to be given a reasonable interpretation.

2. While it is true no particular form of books is required, and such stipulations are substantially complied with when data can be produced which shows the real state of facts, yet there must be at least sufficient written evidence to enable a person of ordinary intelligence, familiar with accounts, to determine with accuracy the amount of liability.

3. Such covenant is not performed by the production of a stock book, bills, cancelled checks, and bank book, where there is nothing therein to show the prices at which goods were bought or sold, or from which it can be determined what goods were in fact stolen.

4. In such case, the fact that the insured had been in business only a short time, and had but a small trade, is no excuse, where it appears that he did not even pretend to keep the usual books of account, and the only book produced contained false statements as to prices.

Argued April 24, 1925. Appeals, Nos. 273 and 274, by plaintiff, from judgments of C. P. No. 5, Phila. Co., Jan. T., 1921, Nos. 1776 and 1777, for defendants n. o.

v., in cases of Harry M. Gorson v. Ætna Accident & Liability Co. of New York, and Harry M. Gorson v. Preferred Accident Ins. Co. of New York. Before Mosch-zisker, C. J., Frazer, Walling, Simpson, Kephart, Sadler and Schaffer, JJ. Affirmed.

Assumpsit on policies of burglary insurance. Before Smith, J.

The opinion of the Supreme Court states the facts. Verdict for plaintiff against the Preferred Accident Ins. Co., for $5,000 and against the Ætna Accident & Liability Co. for $2,500. Judgments for defendants n. o. v. Plaintiff appealed.

*Errors assigned* were judgments n. o. v., quoting record.

*Harry Shapiro,* for appellant, cited: Schwartz v. Surety Co., 113 N. Y. Sup. 66; Leiman v. Surety Co., 111 N. Y. Sup. 536; Leiman v. Surety Co., 204 N. Y. Sup. 796.

*Harry S. Ambler, Jr.,* and *Alfred D. Wiler,* for appellees, cited: Weinstein v. Indemnity Co., 277 Pa. 388; Pearlman v. Surety Co., 127 Ap. Div. (N. Y.) 539; Home Ins. Co. v. Williams, 237 Fed. 171; Pelican Ins. Co. v. Wilkerson, 53 Ark. 353, 13 S. W. 1103; Coggins v. Ins. Co., 144 N. Car. 7; Ætna Ins. Co. v. Johnson, 127 Ga. 491; Farmers Fire Ins. Co. v. Bates, 65 Ill. Ap. 37; Western Ins. Co. v. McGlathery, 115 Ala. 213; Phœnix Ins. Co. v. Bourgeois, 105 Miss. 698; Miller v. Ins. Co., 127 Md. 140.

Opinion by Mr. Chief Justice Moschzisker, May 25, 1925:

Plaintiff, Harry M. Gorson, trading as Gorson's Fur Shop, was engaged in the business of purchasing, making, selling and repairing furs and fur garments of vari-

ous descriptions. In two policies, taken out by him with defendant companies, he insured his goods against loss by burglary, the first policy, in the amount of $5,000, being issued on November 9, 1920, by the Preferred Accident Insurance Company of New York, and the second, for $2,500, on November 17, 1920, by the Ætna Accident & Liability Company. The latter policy was what is known as excess insurance, under which the insurer is not liable for any sum unless the claim against the first company exceeds $5,000. In other respects, the policies were substantially the same, and contained the terms and conditions usually found in insurance contracts of this character.

The only provision in the policies which we need consider on the present appeals relates to the keeping, by the assured, of proper account, as a condition precedent to recover, it being specially stipulated in the Preferred Company's policy that "the company shall not be liable for loss or damage to merchandise . . . if the accounts of the assured are not so kept that the actual loss may be accurately determined therefrom by the company"; and in the Ætna policy, to the same effect, that the company shall not be liable "if the books and accounts of the assured are not so kept that the company may accurately determine therefrom the actual amount of loss or damage."

Plaintiff had been in business approximately seven weeks (having opened on November 1, 1920), when burglars, early in the morning of December 20, 1920, entered his store and removed a quantity of merchandise whose value, as given in the proof of loss to the insurance companies, was $8,893.75. Claims for compensation were accordingly made, and, on refusal by the companies to pay, plaintiff instituted the present actions, alleging in his statements of claim a loss of $8,945.

Both cases were tried at the same time, and the companies set up substantially like defenses, contending that assured had violated certain conditions under the

respective policies, particularly the sections, hereinbefore noted, concerning the keeping of books and accounts. Verdicts were rendered for plaintiff in each case to the full amount of the policy; but, on motions of defendants, the court below granted them judgments n. o. v.

While noting the fact that other defenses were raised, the court, in its opinion entering judgments for defendants, discusses only, what it holds to be, plaintiff's failure to keep proper books and accounts, as required by the policies. In view of this failure, and on the authority of our opinion in Weinstein v. Globe Indemnity Co., 277 Pa. 388, the court decided that plaintiff could not recover in law; hence these appeals.

We are not convinced there was error. Stipulations in burglary policies covering business establishments, that "books and accounts" shall be kept by the insured, so that, in case of theft, the exact loss can be ascertained, are, as we observed in the Weinstein Case (p. 391), to be given "a reasonable interpretation." While it is true no particular form of books is required, and such stipulations are substantially complied with when data can be produced which show the real state of facts, yet there must be at least sufficient written evidence to enable a person of ordinary intelligence, familiar with accounts, "to determine with accuracy the amount of liability."

To a certain extent each case must be judged on its own circumstances, and no uniform rule, further than as above stated, can be laid down for determining the sufficiency of accounts in general; but, in the present case, plaintiff failed to produce, or show that he had systematically kept, any data from which his loss could be determined. He had been in business only a short time, and, having regard to this circumstance, as well as to the small size of the trade involved, his counsel contends it would be unreasonable to expect him to install an elaborate accounting system; but the fact is, he made no pretense of keeping even the usual books of account. The only evidence of this character presented

by him consisted of what he called an "inventory or stock book" containing uninforming entries, in his own handwriting, as explained in the next paragraph), a mass of bills for purchases of coats, skins and furs, together with cancelled checks, alleged to have been used for paying some of these bills. In addition, he exhibited his bank book showing deposits of receipts from sales of merchandise.

The inventory or stock book, which plaintiff said showed "practically everything," listed the stock under three headings, "Fur Coats," "Stoles or Chokers," and "Skins," with the supposed cost prices and those at which the articles were being held for sale noted in separate columns. After certain items, under the headings "Coats" and "Stoles," the word "Sold" had been written in lead pencil, but at what prices or to whom the articles had been sold, or what disposition was made of the proceeds, was not indicated or attempted to be shown. In point of fact, the indicated prices of all the articles in the book were, according to plaintiff's own testimony, not the real prices, but fictitious entries purposely made in order that no one in the shop might "know exactly what [the articles] cost."

The importance of accuracy in this so-called stock book, when it comes to determining plaintiff's actual loss, is obvious. On examining, it, however, one cannot discover by the entries therein from what source or at what prices the various articles were obtained; particularly is this true as regards the "Fur Coats," and there is nothing to distinguish those which were purchased from those alleged to have been made. Plaintiff contended that certain bills, with checks in payment of them, identified the coats which had been manu-factured by others, consequently the remainder were his own make; but, on comparing the book with the bills, we do not find such a relation established. Again, no evidence is presented which details the number of skins or the cost of labor employed in the manufacture of

coats and stoles made by plaintiff; therefore, even if such articles were identified, it would be impossible to ascertain in what manner plaintiff calculated their cost price. True, plaintiff testified that, from his experience, he could estimate the number of skins used in each stolen garment, and that the labor costs would appear from certain checks. As to these suggestions, it is enough to say that the accuracy of the first method of proof would be open to considerable doubt and it is not the kind of evidence contemplated by the policies; while the labor items appear to have been paid either by check or cash, and no records of the cash disbursements were kept. Before leaving the subject of the stock book, we may note that plaintiff, in making up the proof of loss, employed an expert accountant to prepare his claim, and all articles listed, as well as some unlisted, in this book, which were not shown as sold before, or were not on hand immediately after, the burglary, were treated as stolen.

In considering the heading "Skins," it cannot be determined from the bills of purchase and the checks, supposedly in payment of them, whether the total number of skins on hand prior to the burglary is correct; for the book entries, supplemented by the bills of purchase, do not indicate from what source or at what prices all the skins were obtained. Furthermore, as plaintiff was unable to produce evidence to show how many skins, from time to time, had been used in the manufacture and repair of coats and stoles, there is no reasonably certain way of telling the total number of skins stolen.

That the bank deposit book fails to represent the real facts concerning cash sales appears in plaintiff's own testimony, which admits that all moneys so received were not deposited, some having been used to pay workmen's wages. Other examples of the insufficiency of the evidence depended on might be mentioned, such as that to prove the claim for loss of silks, the amount of which, plaintiff himself testified, was only a guess and

not calculated from any data he possessed in the way of accounts. After carefully considering the entire record, we think the court below rightly ruled that, since plaintiff had not kept or produced sufficient written evidence from which his alleged loss could be accurately determined, he had failed to fulfill the requirements of the policies and could not recover.

The judgment is affirmed.